**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------X

UNITED STATES OF AMERICA,

                v.                                        22-CR-617 (JPO)

MONA FAIZ MONTRAGE,

                Defendant.

-------------------------------------------------X

**<u>SENTENCING MEMORANDUM ON</u>**
**<u>BEHALF OF MONA FAIZ MONTRAGE</u>**

Elena Fast, Esq.
Michael Perkins, Esq.
The Fast Law Firm, P.C.
521 Fifth Avenue, 17 Floor
New York, New York 10175
Phone: (212)729-9494
*Counsel for Mona Faiz Montrage*

## **TABLE OF CONTENTS**

I. PRELIMINARY STATEMENT........................................................................................3

II. LEGAL STANDARD..................................................................................................... 3

III. PROCEDURAL HISTORY.............................................................................................4

IV. NATURE AND CIRCUMSTANCES OF THE OFFENSE.........................................5

    A. Guidelines Calculations............................................................................................ 9

V. HISTORY AND CHARACTERISTICS OF MS. MONTRAGE........................... 10

    A. Early and Family Life.............................................................................................. 11

    B. Domestic Abuse....................................................................................................... 13

    C. Mona's Professional Development..........................................................................16

    D. Charitable Endeavors.............................................................................................. 18

    E. Immigration Status and Collateral Consequences of Conviction...........................19

    F. Negative Outcomes from the Incarceration of Single Mothers...........................19

VI. THE STATUTORY GOALS OF SENTENCING ARE SATISFIED WITH A THREE
MONTH TERM OF IMPRISONMENT.......................................................................... 23

VII. CONCLUSION.......................................................................................................... 24

## I.    PRELIMINARY STATEMENT

Ms. Mona Faiz Montrage (hereinafter "Mona"), requests that this Court consider all the factors contained herein and decide on a sentence that is sufficient, but not greater than necessary, to accomplish the stated objectives found in 18 U.S.C. § 3553(a). Mona's offense resulted in financial loss to several victims, and we acknowledge that punishment is necessary. However, the advisory Guidelines recommend a sentence that is far harsher than necessary in light of both the offense conduct and Ms. Montrage's individual nature and characteristics under 3553(a).

The Defense respectfully submits that a probationary sentence would have been appropriate upon due consideration of all of the 18 U.S.C. § 3553(a) factors, but because of Mona's immigration status (discussed in greater detail, *infra*), a term of probation would likely result in Mona's immediate detention by U.S. Immigration and Customs Enforcement (ICE), and subsequent deportation. Accordingly, the Defense submits that a sentence of three months incarceration is sufficient, but no greater than necessary, to achieve the statutory goals of sentencing.

## II.    LEGAL STANDARD

Under 18 U.S.C. § 3553(a), sentences shall be "sufficient, but not greater than necessary" to achieve the basic goals of retribution, rehabilitation, specific and general deterrence. To arrive at such a sentence, district courts are directed to consider: (1) the nature and circumstances of the offense and the history and characteristics of the offender; (2) the need for the sentence imposed to provide just punishment, deterrence, and needed educational and vocational training; (3) the

kinds of sentences available; (4) the Guidelines-range and any pertinent policy statements issued by the Sentencing Commission; (5) the need to avoid unwarranted sentence disparities among similarly situated defendants; and (6) the need to provide restitution. *See* 18 U.S.C. § 3553(a). In every case, the sentencing court "must make an individual assessment based on the facts presented." *Gall v. United States*, 128 S.Ct. 586, 597 (2007).

### III.    PROCEDURAL HISTORY

On November 23, 2021, a sealed three count complaint was sworn out before U.S. Magistrate Judge Stewart D. Aaron of the Southern District of New York. On November 10, 2022, pursuant to an arrest warrant issued in the Southern District of New York, and at the request of the Federal Bureau of Investigation, Mona was arrested by authorities in the United Kingdom. Also, on November 10, 2022, a grand jury in the Southern District of New York returned a six-count indictment, charging her with money laundering conspiracy, wire fraud, wire fraud conspiracy, and receipt of stolen property. Extradition proceedings were initiated against Mona in the United Kingdom, but she would ultimately waive extradition and voluntarily surrender to authorities in the United States on May 15, 2023, against her then-attorney's advice.

Mona served nine days in the custody of Essex County Correctional Facility before being released on home detention enforced by electronic monitoring after pledging $500,000 bond, secured by $100,000, and signed by three financially responsible persons. Since her release, Mona has resided in Union, NJ with her aunt, Ms. Ayishetu Alhassan.

On February 21, 2024, Mona appeared before the Hon. Magistrate Judge Sarah L. Cave and pleaded guilty pursuant to a written plea agreement to Count 5 of the Indictment, Conspiracy to Receive Stolen Money in violation of 18 United States Code § 2315. On June 28, 2024, Ms.

Montrage is scheduled to appear for sentencing before the Honorable U.S. District Court Judge J. Paul Oetken.

## IV.    NATURE AND CIRCUMSTANCES OF THE OFFENSE

The charging documents in this case, a three count Complaint filed November 23, 2021 (ECF No. 1), and a six count Indictment filed on November 10, 2022 (ECF No. 5), allege that Mona and other unindicted coconspirators based out of Ghana (hereinafter the "Enterprise"), perpetrated a series of frauds, frequently in the form of romance scams, which defrauded multiple victims out of substantial sums of money. Specifically, the Indictment alleged that the Enterprise targeted primarily elderly and vulnerable men and women who, through voice calls, text messaging, dating sites, and social media interactions, were deceived into believing that they were in a romantic relationship with a non-existent person who, in reality, was being portrayed by various members of the Enterprise. Once the members of the Enterprise had built sufficient trust with the victims, they would solicit wire transfers under false pretenses, with the funds being deposited in the bank accounts of members of the Enterprise, including accounts belonging to Mona. Specifically, the Complaint alleged that fraud proceeds were deposited into at least five bank accounts controlled by Ms. Montrage, who subsequently withdrew or distributed the funds to other coconspirators.

The Indictment further alleges that Mona "directly communicated with at least one romance scam victim ("Victim-1"),"[1] and "obtained money from Victim-1 by, among other things, pretending that she and Victim-1 were in a romantic relationship and married." ECF No.

---

[1]    This victim was referred to as "Victim-3" in the Complaint, and as "Victim-1" in the Indictment. This submission will refer to him as "Victim-1".

5, ¶ 3. As further elucidated in the Complaint, Victim-1, a male over sixty-years-old and resident of Texas, entered into an "online relationship" with an individual purporting to be "Mona Montrage." ECF No. 1, ¶ 14(a). Victim-1 claims that "Mona" sent him several photos of herself, spoke to him over the phone on several occasions, and sent him a "tribal marriage certificate," which "Mona" claimed was proof of their marriage in the country of Ghana. *Id*. "Mona" began to repeatedly request that Victim-1 send her money to help with her father's farm in Ghana. *Id*. In response to these requests, between April 2015 and July 2016, Victim-1 made dozens of wire transfers totalling nearly $89,000. *Id*.

According to a FD-302 memorializing an April 2021 interview with Victim-1 that was produced in discovery (USAO_13056), approximately a year into their "relationship," he began to "distrust" the person he believed to be Mona Montrage. Victim-1 came to learn that Mona was present in the United States, residing in the Bronx with her friend, Milan. By looking through photos posted on Mona's public social media profiles, Victim-1 was able to identify pictures of Mona and Milan in the Bronx, and "did research online and was able to determine her address from photographs and context she provided him during their conversations." In July 2015, he flew from Texas to New York "with the intention of finally meeting [Mona] in person," and "was scheduled to meet [Mona] for dinner at a restaurant at 7:00 PM."

After Mona failed to show up for their dinner reservation, he "attempted to confront" Mona outside of her residence in the Bronx. ECF No. 1, ¶ 14(d). Though they had never met in person before, he recognized Mona from the pictures he had been sent and further claimed to have recognized her voice based on their prior phone conversations. *Id*. During this "confrontation" outside of her home, Mona denied knowing who Victim-1 was, but Victim-1 would later claim to have had further phone conversations with "Mona," during which she

apologized and acknowledged having met with him in the Bronx. *Id*. Some time later, Victim-1 stumbled upon Mona's Instagram account, and informed law enforcement that Ms. Montrage was the person "he believed he had married and that he previously confronted." ECF No. 1, ¶ 14(e).

While it is entirely possible that Victim-1 may believe the sequence of events as he retells them, his account is factually untrue. Mona categorically denies ever communicating with Victim-1, or any other victim, aside from the single occurrence where Ms. Montrage was "confronted" by Victim-1 in person in the Bronx. During that confrontation, Mona was entirely truthful when she informed Victim-1 that she did not know who he was. Victim-1's claims that he spoke to "Mona" on the phone on a date after the confrontation, where she purportedly acknowledged their meeting and apologized, was regrettably yet another act of deception attributable to other members of the Enterprise. The Defense in no way seeks to disparage Victim-1's character, but submits that he, like others who fall prey to similar schemes, is naive and easily deceived by exceedingly obvious ruses such as these. The Defense further submits that Victim-1 is not a reliable narrator as to Mona's actual participation in the conspiracy, and that his statements regarding same should be disregarded in their entirety.

Mona stands by her plea allocution that her involvement in the conspiracy was limited to allowing her bank accounts to be used by other members of the Enterprise to deposit, transfer and withdraw fraudulent proceeds. *See* PSR ¶ 44. Furthermore, Mona stands by her statements made to U.S. Probation Officer Jill Jefferies that during the earlier portions of the charged time frame, she was unaware of the unlawful nature of the funds that were passing through her bank accounts, though she does acknowledge that, at some point, she did learn that the funds were unlawfully obtained and did continue to allow her accounts to be used for that purpose. PSR ¶

45. Just as importantly, Mona voluntarily withdrew from the conspiracy prior to any law enforcement intervention.

In support of her contention that she had no knowledge that her name, image, and likeness were being used to deceive victims of the scheme, Mona submits a letter of support from Mr. Sam Cross (annexed hereto as *Defense Exhibit B*), a victim of the "Mona Montrage" romance fraud scam. Mr. Cross is a 76-year-old man residing in Atlanta, Georgia, who for twenty months, believed that he was in a romantic relationship with a person purporting to be Mona Montrage. The ruse, which was entirely consistent with the allegations in the charging documents, had Mr. Cross under the impression that he was religiously married to Mona in Ghana. In the process, he was induced to send "Mona" over $70,000, purportedly to pay for her leukemia treatment, legal fees for a lawsuit against her manager, filing fees for their jointly formed corporation "Mona Cross Entertainment," and other similarly outlandish causes. After Mona's arrest in the United Kingdom, during her incarceration at Essex County Jail, and even after she was placed on home detention, Mr. Cross continued to speak on the phone with the person whom he believed was Mona Montrage. During these phone calls, Mr. Cross was induced to send even more money under false pretenses. Mr. Cross cites his phone records, which show nearly one hundred phone calls between himself and "Mona" between April and June 2023, including three phone calls on May 16, 2023, a day on which Ms. Montrage was in custody at Essex County Correctional Facility and did not have access to a cell phone.

Upon learning that Mona had been arrested in the United States pursuant to the instant indictment, Mr. Cross reached out to Mona's then-attorney, Adam Cortez, Esq., to confirm whether the allegations made against his "wife" were true. Mr. Cortez coordinated a video call between Mr. Cross and Mona, and Mr. Cross walked away from the conversation believing that

Mona did not play any role in, nor was she aware of, the scam. In a later conversation with the "real" Mona Montrage, Mr. Cross provided a video that he had been sent, which depicts Mona seemingly speaking lovingly to an individual she refers to as "Sam." However, upon closer inspection, the audio in the video is completely out of sync with the movement of Mona's mouth and it is readily apparent that this was a poorly edited forgery. Recognizing the video as something she had previously posted on social media, Mona was able to locate the original video with the original audio.[2] Mr. Cross notes that he continued to receive calls and text messages from the person purporting to be Mona Montrage through October 2023, and communicated to this person that he had already made contact with the "real" Mona.

### A. Guidelines Calculations

Pursuant to a written plea agreement dated February 16, 2024, the parties stipulated to the following Guidelines calculations:

Base offense level is 6 (USSG §2B1.1(a)(1))

+ 16-level increase because the loss amount is more than $1,500,000 but less than $3,500,000 (USSG §2B1.1(b)(1)(I))

+ 2 level increase because the offense involved ten or more victims (USSG §2B1.1(b)(2)(A)(i))

+ 2 level increase because a substantial part of a fraudulent scheme was committed from outside the United States (USSG §2B1.1(b)(10)(B))

− 2 level decrease because Ms. Montrage is a zero-point offender (USSG §4C1.1, making Ms. Montrage a CHC of I)

− 2 level decrease because Ms. Montrage has clearly demonstrated acceptance of

---

[2]     A comparison of the two videos is available at: https://shorturl.at/FCzmQ

responsibility (USSG §3E1.1(a))

– 1 level decrease because Ms. Montrage provided the Government timely notice of
   her intention to enter a plea of guilty (USSG §3E1.1(b)).

**Total Offense Level: 21**. Pursuant to the sentencing table in USSG Ch. 5 Pt. A, based on
a Total Offense Level of 21 and a Criminal History Category of I, the Guidelines range is
37 to 46 months imprisonment.

## V.    HISTORY AND CHARACTERISTICS OF MS. MONTRAGE

The Defense respectfully submits that a Guidelines sentence is unduly harsh in light of
Mona's 18 U.S.C. §3553(a) characteristics. Rather than relying on the Guidelines, a sentencing
court must make an individualized assessment as to the appropriate sentence based on the facts
presented and in light of each of the factors set forth in § 3553(a). *See United States v. Cavera*,
550 F.3d 180, 188 (2d Cir. 2008) ("A sentencing judge has very wide latitude to decide the
proper degree of punishment for an individual offender and a particular crime."). While the
Court must calculate the applicable Sentencing Guidelines range, "[t]he Guidelines are not only
not mandatory on sentencing courts; they are also not to be presumed reasonable." *Nelson v.
United States*, 555 U.S. 350, 352 (2009).

In support of her history and characteristics under 18 U.S.C. §3553(a), Mona submits a
letter to the Court on her own behalf (annexed hereto as *Defense Exhibit A*), in addition to letters
from family, friends, and associates in the entertainment industry. *Defense Exhibits B and C*. The
letters describe Mona as an exceptionally generous and empathetic young woman, who is a
loving single-mother to her daughter, N██, now eight. The letters detail how after leaving an
████████████████ relationship, Mona has been able to establish a successful career as
an entertainer and inspire countless Ghanaians in the process. Specifically, in support of her

10

§3553(a) characteristics, Mona submits letters from Fatimah Braimah (mother), Sharif Faiz Montrage (brother), Mustapha Faiz Montrage (brother), Ayishetu Alhassan (aunt), Fatahia Chung (cousin), Mamaga Abui Buiekpor (godmother), Sam Cross (victim of fraud), Iman Ibrahim (Chief Imam and Spiritual Leader of Moglaa Village), Hashimyu Haruna (founder of Ghana Entertainment Awards USA), Kevin Heward-Mills (Mona's official DJ and radio host), Emmanuella Aseye Nyamadi (friend and employee), Bennett Osei (friend and personal photographer), David Aboamah (friend and Ghanaian musician), Believe E. Essor (friend and professional dancer), Divine Munachi (friend and personal makeup artist), Stephen Mingle (friend and video blogger), Erskine Amo Whyte (friend and Ghanaian radio broadcaster), Mutiatu Sumail (childhood friend), Nana Aba Pieterson (former classmate and longtime friend), Mary Kang (longtime friend), Amira Abdulai (longtime friend), Augustina Quainoo (longtime friend), Cassandra Obiri (friend), Mildred Quartey (a fan and now-friend), and Kang Mina (fan). The Defense has also obtained a letter from Lauren Anselowitz, Esq., an immigration attorney for Ms. Montrage to shed light on the deportation issues.

### A. Early and Family Life

Mona Faiz Montrage was born on ███████████, in Accra, the capital city of Ghana, Africa. Mona is the eldest of the four children born to father, Faiz Montrage, and mother, Fatimah Braimah, who today reside together in Tamale, Ghana. Mona's siblings, Sharif, Mustapha and Rafiq, ages 18, 25, and 29, respectively, all reside in Tamale with their parents. Mona's father, aged 72, is the local chief of the Dagomba tribe "Sapachin Naa," meaning "chief warrior." The Dagomba people are the dominant ethnic group in the northern region of Ghana

who trace their lineage all the way back to the 14th century.[3] Mona's mother, aged 53, is now a homemaker who previously owned and operated a restaurant.

By all accounts, Mona and her siblings did not have an easy childhood. Prior to marrying their mother, their father had previously been married to another woman and fathered five daughters. His first marriage had deteriorated as the result of his then-wife engaging in an extramarital affair, ending in their divorce, and paving the way for his subsequent marriage to Mona's mother. Despite his new marriage, and the birth of Mona and her brothers, her father continued to be insecure because of his first wife's infidelity. This resulted in frustration.

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

Mona's parents separated when she was ten years old.

After her parents' separation, Mona, her mother, and two younger brothers stayed with several of her maternal aunts; drifting from home to home on a regular basis, Mona frequently changed schools. For years, while living with her aunts, her aunts and cousins tormented Mona and her family, including ████████████████████. Despite her father sending money to support Mona and her siblings, her maternal aunts pocketed the money for their own use. By the time she was 16, her mother's ████████████████████████████████████████████ ████████████████████ Thus, Mona and her brothers had no other option but to move in with their father. However, her father had since remarried, marking his third marriage, and had fathered two children. Her new stepmother treated Mona and her brothers much like her aunts did; █████████████████████████████████. Eventually, her father's third marriage

---

[3]     *See* [Dagomba | Ghana, West Africa, Ethnic Group | Britannica](#)

would disintegrate as well, with her stepmother leaving her two sons in the care of Mona's father. Eventually, Mona's mother ████████████████, and Mona and her mother settled down in Accra, Ghana, where they lived together for over a decade.

In December 2013 in New York City, Mona married a man whom she met previously while on a trip to the United States. She immigrated to the United States in 2014, residing in Brooklyn and the Bronx, and working for a property management company before eventually starting her own e-commerce business, selling cosmetics. Mona separated from her husband in 2015 due to his infidelity and started a new relationship with a Ghanaian man, Luvman Allison, later that year. Mona's relationship with Luvman between 2015 and 2019 ultimately produced a daughter, N███ A████, now eight.



████████████████████████████████████████████

████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████

Mona's tumultuous romantic relationship with Luvman, which lasted from 2015 to 2019, spanned most of the time period charged in the Indictment, and the entirety of Mona's actual participation. The Defense submits that, unbeknownst to the government at that time, Luvman had been supporting himself for years on pretrial release by engaging in fraud, long before ever meeting Mona. After meeting Mona, and lulling her into a false sense of security that they were in a committed romantic relationship, Luvman told her that because of his court-ordered supervision, he could not use his own bank accounts and needed to use hers instead. PSR ¶ 74. Mona agreed to this arrangement, under the impression that she was helping the man she loved further his legitimate business interests, not knowing that the money coming into her accounts

was criminally derived. It was only at some point in 2018 that Mona came to learn that the money that Luvman was diverting through her bank accounts was not legitimate. Mona readily admits that after learning about the unlawful nature of the funds, she continued to allow Luvman to use her bank accounts, but that decision was influenced by multiple years ███████, ████████████████████████████████████████████████████ Specifically, when she would directly confront him about the source of the money, ███████████ PSR ¶ 74.

Ms. Ayishetu Alhassan, Mona's aunt who cosigned her bond and has taken her into her New Jersey home since her arrest. ████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████

Ms. Chung, Mona's cousin and cosigner on her bond, recalls ██████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████

**C. Mona's Professional Development**

In the five years since Mona allowed stolen money to pass through her bank accounts and gained the courage to leave Luvman, she has risen from poverty and her broken dreams in the United States to become one of Ghana's most recognizable celebrities. Mona today is not the same person who was involved in the conspiracy to receive stolen funds over five years ago. Gone is the naive twenty-something who was wooed by false promises and gifts lavished upon her by an ██████ conman. As she currently stands before the Court, Mona is a mature, intelligent, and compassionate woman. She is a beloved friend, mother, daughter, niece, and inspiration to many supporters across the world.

As detailed in *Defense Exhibit E*, Mona was able to build an organic social media following of over five million predominantly millennial women who follow her "daily posts on her Instagram, TikTok, and Snapchat where she shares anything from music, fashion, lifestyle, family life, travel, etc." For instance, Ms. Mildred Quartey and Ms. Kang Mina, both fans, write to the Court in support of Mona's character and positive influence. Ms. Mina, who has been following Mona for the past four years, writes as "not only as a fan but as someone deeply touched by Mona's altruistic spirit," and considers Mona's humility and generosity to be "remarkable qualities that set her apart in the realm of celebrity." Ms. Quartey had been a fan of Mona's, admiring her "vibrant energy and positive aura" from afar, when her husband found work as Mona's photographer and videographer. When Ms. Quartey finally got the opportunity to meet Mona, "her welcoming demeanor surpassed [her] expectations," and the two remain friends today. More recently, Mona has taken a foray into music with substantial success, winning several awards and having been recognized as the "biggest female artiste in Ghana," with her first four singles averaging over one million views on YouTube. *Defense Exhibit E*, MM 44-45. Mona's musical contributions have been recognized with awards at the 2022 Ghana Entertainment Awards USA for "Female Discovery of the Year," and at the 2022 Music Awards for "Emerging Woman of the Year," in addition to many more nominations. *Id.* at 50-51.

Since her brief incarceration, Mona has resided in New Jersey with her family and her career has effectively been put on hold. Due to her lack of immigration status, Mona has been unable to work in the United States. Since her initial arrest in London, Mona has voluntarily withdrawn from the public spotlight, having made only a small handful of social media posts before deactivating her Instagram account entirely just prior to entering her guilty plea in February of this year. However, not wanting to be complacent during the pendency of her case,

Mona elected to advance her education by taking two college level courses at Union College during the Spring 2024 semester. *Defense Exhibit F* – College Transcript. Though she has enjoyed her studies, she is eager to get back to work to start paying back the restitution and forfeiture.

### D. Charitable Endeavors

Since a young age, Mona has been dedicated to helping the economically disadvantaged members of the Ghanaian community. Ghana is amongst the world's poorest nations, with a GDP per capita of $5,500, 168th in the world.[5] Mona's letters of support are replete with accounts of her work with orphanages and the homeless community in Ghana. Mona would often volunteer at orphanages not for a public relations boost for her social media or music career, but because she genuinely wants to eradicate poverty and improve the quality of life in her native home of Ghana.

In her letter of support, Ms. Augustina Quainoo – former supervisor of the Tamale Children's Home[6] – recalls that even as a young girl, Mona would regularly volunteer at her orphanage. Over the years, Mona's charitable spirit has not diminished, still supporting the orphanage with sometimes anonymous donations.[7] Similarly, Mr. Iman Ibrahim – chief imam and spiritual leader of Moglaa Village, Tamale, Ghana[8] – who has known Mona since birth, lauds her longtime charitable efforts in the Tamale community, which include: building two wells for the local community, paying school tuition and medical bills for local children, and assisting with the reconstruction of a local school after it had been devastated by a flood.

---

5    *See:* [Real GDP per capita](#)
6    *See:* [Church of Jesus Christ Renovates Buildings at Orphanage in Tamale, Ghana](#)
7    *See:* [Mona 4Reall donates to Darko Yaw Bentum DA Basic School](#)
8    *See:* [Moglaa - Wikipedia](#)

Moreover, in the annexed letters of support, many of the authors discuss gifts and financial assistance that Mona had given to them, including: DJ equipment, rent payments, school tuition, toys, shoes, medical bills, etc. It should be noted that these financial contributions have all taken place after Mona's rise to prominence in entertainment, and not during the time period charged for the offense.

### E. Immigration Status and Collateral Consequences of Conviction

In preparation for sentencing, the Defense consulted with Mona's immigration attorney, Lauren Anselowitz, Esq., to ascertain which sentencing options are viable for someone with no lawful permanent resident status in the United States. *See* PSR ¶ 26. Ms. Anselowitz advises the Court in a letter annexed hereto as *Defense Exhibit D*, that the instant offense is a crime involving moral turpitude and possibly an aggravated felony within the meaning of 8 U.S.C. § 1101(a)(43), and will result in Mona's removal from the United States.

Ms. Anselowitz further informed Defense counsel that a non-custodial sentence would still most likely result in U.S. Immigration and Customs Enforcement (ICE) intervention, because Mona is removable simply by the fact that she will have been convicted of a crime involving moral turpitude, regardless of the sentence imposed by the Court. According to Ms. Anselowitz, if sentenced to a term of probation, Mona would be unlikely to complete the sentence; instead, she would likely go directly into ICE custody, and deported therefrom.

### F. Negative Outcomes from the Incarceration of Single Mothers

Mona is a single mother to her eight year old daughter, N█ A█. N█ was born out of the █████ relationship between Mona and Luvman Allison, and has had to endure an incredibly traumatic experience during the pendency of her mother's criminal case. N█ lived through her mother's arrest in London, the subsequent extradition proceedings, her arrest,

incarceration and home confinement in the United States. For the past year and a half, N███ has been living in New Jersey, a place entirely unknown to her. N███ has been uprooted from her native country, Ghana, and her schooling, social life, and medical care have all been in flux as a result. While Mona is forever indebted to her family in the United States, including Ms. Alhassan and Ms. Chung, for their continued support of herself and N███ over the past year, Mona is cognizant of the fact they will not be able to raise N███ indefinitely should the Court impose a sentence of imprisonment in line with the Guidelines range of 37-46 months, or even U.S. Probation's recommendation of 27 months. *See* PSR ¶ 25.

As the Court is undoubtedly aware, between 1980 and 2021, the number of incarcerated women in the United States increased by more than 525%.[9] An overwhelming majority of these incarcerated women have minor children, and unlike their male counterparts, most of them are single parents.[10] Research has continually demonstrated that the incarceration of primary caregivers has devastating consequences on not only the parent, but to the dependent child. In the case of an incarcerated single parent, "the child may be separated from the only parent he or she knows, often with devastating consequences for the child's development, education, and present and future well-being."[11] The incarceration of single parents can have an adverse impact on deterring future criminal activity on the part of both the parent and the child, because the "incarceration model results in an increased likelihood of recidivism and intergenerational incarceration in the aftermath of the separation of mother and child."[12] The Defense submits that

---

[9]     The Sentencing Project, *Incarcerated Women and Girls*, available at: [Incarcerated Women and Girls – The Sentencing Project](Incarcerated Women and Girls – The Sentencing Project)
[10]     The Equal Justice Initiative, *Over-Incarceration of Mothers Takes Serious Toll on Children*, available at: [Over-Incarceration of Mothers Takes Serious Toll on Children](Over-Incarceration of Mothers Takes Serious Toll on Children)
[11]     Sarah Abramowicz, *Rethinking Parental Incarceration*, 82 U. Colo. L. Rev. 793, 811 (2011)
[12]     Christina Scotti, *Generating Trauma: How the United States Violates the Human Rights of Incarcerated Mothers and Their Children*, 23 CUNY L. Rev. 38, 68 (2020)

because of the potential harm to eight-year-old N███ in the form of developmental issues, lost financial support, and loss of caretaking as a result of Mona's potential incarceration, that the Court should take this circumstance into consideration and grant a downward variance under 18 U.S.C. § 3553(a).

While the Defense seeks a variance and not a departure from the applicable Guidelines range, all pertinent policy statements issued by the United States Sentencing Commission (USSC) must be considered by the sentencing court in determining the appropriate sentence. *See* 18 U.S.C. § 3553(a)(5). In a policy statement codified in USSG §5H1.6, entitled *Family Ties and Responsibilities*, the USSC states that, "family ties and responsibilities are not *ordinarily* relevant in determining whether a departure may be warranted." (emphasis added). In determining whether a departure from the applicable Guidelines range *is* warranted, the sentencing court shall consider the following non-exhaustive list of circumstances: (i) the seriousness of the offense; (ii) the involvement in the offense, if any, of members of the defendant's family; and (iii) the danger, if any, to members of the defendant's family as a result of the offense. USSG §5H1.6, cmt. n. (1)(A). Moreover, a departure pursuant to §5H1.6 based on the loss of caretaking or financial support of the defendant's family may be warranted if in addition to the court's consideration of the non-exhaustive list of circumstances above, the following circumstances are present:

> "(i) The defendant's service of a sentence within the applicable guideline range will cause a substantial, direct, and specific loss of essential caretaking, or essential financial support, to the defendant's family.
>
> (ii) The loss of caretaking or financial support substantially exceeds the harm ordinarily incident to incarceration for a similarly situated defendant.  For example, the fact that the defendant's family might incur some degree of financial hardship

or suffer to some extent from the absence of a parent through incarceration is not in itself sufficient as a basis for departure because such hardship or suffering is of a sort ordinarily incident to incarceration.

(iii) The loss of caretaking or financial support is one for which no effective remedial or ameliorative programs reasonably are available, making the defendant's caretaking or financial support irreplaceable to the defendant's family.

(iv)   The departure effectively will address the loss of caretaking or financial support."

*Id.*, cmt. n. 1(B).

The offense conduct here did not involve any member of Mona's family, nor is there danger posed to any family member as a result of the offense. While the offense is absolutely serious, as it caused financial loss to innocent victims, there was no violence or threats thereof during the commission of the offense. Moreover, in regards to Mona's actual participation in the scheme, her involvement was limited to receiving, withdrawing and transmitting the stolen funds that passed through her accounts. Furthermore, when analyzing the specific circumstances relevant to loss of financial support and caretaking, each weigh strongly in favor of the Court granting a variance. If a Guidelines sentence were to be imposed in this case, it would cause a substantial, direct, and specific loss of essential caretaking and financial support for N█, as Mona is N██'s sole source of financial support and caretaker. Because Mona is a single mother, the loss of caretaking and financial support to N█ would substantially exceed the harm ordinarily incident to incarceration for any offender in a two-parent household. Nor are there remedial or ameliorative programs reasonably available that could possibly substitute for a mother's own caretaking, love, and support during a child's formative years; Mona's support is irreplaceable to N█. Finally, a sentence well below Guidelines will effectively address the loss

of caretaking or financial support because the less time Mona spends incarcerated, the more availability she will have to raise her daughter and earn a living.

## VI.    THE STATUTORY GOALS OF SENTENCING ARE SATISFIED WITH A THREE MONTH TERM OF IMPRISONMENT

Under 18 U.S.C. § 3553(a)(2), the sentencing court is required to consider the need of the sentence imposed (a) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (b) to afford adequate deterrence to criminal conduct; (c) to protect the public from further crimes of the defendant; and (d) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. Another factor that must be considered in determining the appropriate sentence is "the need to provide restitution to any victims of the offense." 18 U.S.C. § 3553(a)(7). The Defense respectfully submits that in Mona's case, the goals of sentencing are accomplished by a sentence of three months imprisonment. While the Defense believes that a term of probation would have been sufficient to comply with the statutory goals of sentencing, probation simply is not doable for someone with Mona's immigration status.

A three month term of imprisonment is a meaningful period of time that reflects the seriousness of the offense, and during which Mona will be made to contemplate her mistakes. A three month sentence will provide adequate punishment because of the invariably unpleasant and austere conditions of any jail facility. The Defense maintains that Mona is unlikely to recidivate because she has developed a successful and legitimate career, and she does not need to resort to criminality to earn a living. For that reason, the public does not need to be protected from further crimes committed by Mona, because it is exceedingly likely that there will not be any. Moreover, when considering the need to pay restitution in this case, it behooves both the victims and

American taxpayers that Mona resume and begin advancing her career with little time spent incarcerated.

In sum, the Defense believes that Mona's compelling personal history and characteristics, and the substantial mitigating circumstances that bear directly on her culpability for the instant offense, justify this Court's determination that a three month term of imprisonment is sufficient, but no greater than necessary to comply with the aforementioned purposes of sentencing.

## VII.    CONCLUSION

For all the foregoing reasons, Ms. Montrage respectfully requests that this Court exercise its reasoned judgment and impose a sentence that is sufficient, but not greater than necessary to comply with the statutory objectives of sentencing, which the Defense submits is a sentence of three months imprisonment.


Respectfully submitted,

s/ Elena Fast
s/ Michael Perkins
Elena Fast, Esq.
Michael Perkins, Esq.
*Counsel for Mona Faiz Montrage*
The Fast Law Firm, P.C.
521 Fifth Avenue, 17 floor
New York, NY 10175
Phone: (212) 729-9494
Email: elena@fastlawpc.com
        michael@fastlawpc.com